1

2

3

4  **UNITED STATES DISTRICT COURT**

5  **EASTERN DISTRICT OF CALIFORNIA**

6

| | |
|---|---|
| **WILMA SHORE,** | **1:07-CV-01160 OWW SMS** |
| **Plaintiff,** | **MEMORANDUM DECISION RE DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF AND COUNTERCLAIM DEFENDANT WILMA SHORE (Doc. 52.)** |
| **v.** | |
| **KEVIN M. BROWN, ACTING COMMISSIONER OF INTERNAL REVENUE SERVICE OF UNITED STATES OF AMERICA, and DOES 1 through 10 inclusive** | |
| **Defendant.** | |
| **UNITED STATES OF AMERICA,** | |
| **Counterclaimant,** | |
| **v.** | |
| **WILMA SHORE,** | |
| **Counterclaim Defendant.** | |
| **AND** | |
| **GREGORY SHORE and BRENDA O. REYNOLDS** | |
| **Additional Counterclaim Defendants.** | |

26 */// /*

27 */// /*

28 */// /*

1

1

## I. **INTRODUCTION**.

Plaintiff Wilma Shore filed suit against the United States seeking a refund and abatement of tax penalties assessed and/or collected against her as the person responsible for Dean's Materials, Inc. and Dean R. Shore, Inc.'s failure to pay its payroll taxes. The government responded with a counterclaim against Plaintiff to reduce to judgment certain trust fund recovery penalties assessed against Plaintiff. The government contends that Plaintiff, as an officer, director and largest shareholder of Dean's Materials, Inc. and Dean R. Shore, Inc., is responsible for payment of these taxes and acted with reckless disregard to the payment of the federal taxes.

The government now moves, pursuant to Federal Rule of Civil Procedure Rule 56, for summary judgment on its counterclaim against Wilma Shore and for judgment in its favor as to the claims made in Plaintiff's Complaint.[1] Plaintiff has filed opposition, to which the United States has replied.

## II. **FACTUAL BACKGROUND**.

This case arises out of the government's attempt to recover unpaid payroll taxes that were required to but were not withheld from the wages of Dean's Materials, Inc. and Dean R. Shore, Inc. employees for eleven tax periods from April 1, 1997 through December 31, 1999. The facts are largely undisputed.

---

[1] The United States also moved, pursuant to Rule 56, to reduce trust fund recovery penalties to judgment against Gregory Shore and Brenda Reynolds. The motion for summary judgment filed by the United States against Gregory Shore and Brenda Reynolds is resolved by separate Memorandum Decision.

1    Dean's Materials, Inc. and Dean R. Shore, Inc. evolved out of

2  a small acoustical tile business started in 1960 by Dean R. Shore,

3  Plaintiff's deceased husband.  ((Defendant United States' Statement

4  of Disputed Facts ("DSUF") 1).[2]).  Dean's Materials, Inc. sold

5  building supplies in Central California under the trade name

6  Construction Materials Suppliers ("CMS").  (DSUF 3.)  Dean R.

7  Shore, Inc. was a large commercial acoustical tile, plaster and

8  commercial drywall subcontractor that did business under the name

9  Interior Contractors ("INCON").  (DSUF 4.)  Throughout the relevant

10  tax periods at issue in this case, CMS was the parent company and

11  sole shareholder of INCON.  (DSUF 7.)

12    Following Dean R. Shore's death in 1991, Plaintiff became the

13  largest shareholder of CMS and INCON.[3]  (DSUF 9.)  Plaintiff held

14  in excess of 40% of the outstanding shares of CMS and served as co-

15  trustee of two trusts that collectively owned another 40% stake in

16  CMS.  (DSUF 17.)  Plaintiff was also a director of both CMS and

17  INCON from 1991 until her resignation in 1999.[4]  (DSUF 11, 20.)

18  During the eleven tax periods at issue, there were two members of

19  the Board of Directors: Plaintiff and her son Gregory Shore.

20  
21    [2] Plaintiff does not dispute the bulk of Defendant's
   undisputed facts.  To the extent she does, her objections are
22  overruled or immaterial to the ultimate facts of the case.

23    [3] At the time of Dean R. Shore's death, and throughout the tax
   periods at issue in this case, parent company CMS also owned
24  commercial real estate located in Redding, California.  In
   September 1991, this property had a value of $2.7 million. (DSUF
25  8.)  CMS was also the recipient of a sizeable damages award in 1991
   of nearly $5 million, obtained as a result of a lawsuit against a
26  telecommunications company.  (Id.)

27  
28    [4] On September 30, 1996, Jim Shore and Deanna K. Covey
   resigned as officers and directors of CMS and INCON.  (Exh. 4.)

3

1    From 1991 until her resignation in 1999, Plaintiff was the

2  President of CMS and INCON. (DSUF 11, 20.)  Under CMS and INCON's

3  bylaws, Wilma Shore, as President of each company, had "general

4  supervision, direction and control of the business and officers of

5  the corporation." (DSUF 13, 22.)  The bylaws also authorized

6  Plaintiff, as President of each company, to call special meetings

7  of the Board of Directors and to inspect all books, records, and

8  documents of every kind. (DSUF 15-16, 24-25.)

9    From 1991 forward, Plaintiff drew a regular salary and

10 retained the right to sign checks on CMS and INCON's bank

11 accounts.[5] (DSUF 26, 28.)  Although Plaintiff's son, Gregory

12 Shore, ran the daily operations of the business, Wilma Shore

13 reconciled CMS and INCON's bank statements and dealt with outside

14 accounting professionals regarding the preparation of financial

15 statements and corporate disclosure forms. (DSUF 14, 29.)

16 Plaintiff came into the CMS and INCON offices on a regular basis,

17 up to five times per week. (DSUF 27.)  Plaintiff also provided

18 substantial funding to the companies, including the 1993 purchase

19 of a $656,907.00 loan obligation that CMS owed to Bank of America.

20 (DSUF 32-33.)  In 2000, CMS defaulted on the loan and Plaintiff

21 foreclosed on the real estate collateral, consisting of substantial

22 real property in Redding, California.[6]

23 ────────────

24    [5] Specifically, on at least four occasions from March 1999 to
25 July 1999, Plaintiff signed large payroll checks issued to
   employees. (Doc. 59, Exh. 57(a)-(d).)

26    [6] Although the loan was over $150,000 in arrears by 1996,
27 Plaintiff agreed to subordinate her security interest in the
   collateral property in order to obtain an additional $600,000 in
28 financing to CMS. (DSUF 34.)

**4**

During the second half of her eight-year tenure as president of INCON and CMS, the companies encountered severe financial difficulties and cash shortages.  (DSUF 47-55.) It is undisputed that checks bounced, payments were held back, and CMS and INCON failed to timely remit payroll taxes to the Government.[7]  (Id.) According to the government, Plaintiff knew, or should have known, that CMS and INCON were not withholding taxes in 1997 and early 1998 because four checks payable to the IRS, each in the amount of $25,000, were returned for insufficient funds.[8]  (DSUF 103.)  In 1997 and 1998, there were additional checks, ranging from $10,000 to $140,000, made payable to the IRS that "bounced" for insufficient funds.  (Doc. 59, Exhs. 54 & 55.)  In April 1998, CMS and INCON ceased all payments, periodic or otherwise, to the IRS for delinquent employee taxes.[9]  (DSUF 107, 110.)

INCON and CMS retained the accounting firm Hills Renault to prepare annual financial reports for the 1993, 1994, 1995, 1996, 1997, 1998, and 1999 fiscal years.  (DSUF 37.)  Each year, Plaintiff signed the accountants' engagement and representation letters in connection with the preparation of these financial statements, which were given to CMS and INCON's lenders.  (DSUF

---

[7] As early as 1995, Plaintiff made personal loans to INCON to "help cover payroll."  (DSUF 36.)

[8] The reconciled bank records contain Plaintiff's handwritten notes next to each "bounced" check.  (Doc. 59, Exh. 53.)  The records reflect the date the check bounced, the amount ($10,000), the bank code "Return Item Enclosure," and Plaintiff's handwritten check number, i.e., "#9373" and "#9495."  (Id.)

[9] It appears that CMS and INCON made several payments to the IRS to reduce its federal tax liability, however, these efforts ceased in April 1998.

**5**

37.)  In 1996, Hills Renault became concerned about CMS and INCON's financial viability.  During an audit in August 1996, Plaintiff was made personally aware of Hills Renault's concerns by Leslie Kos, an accountant at Hills Renault. (DSUF 88.)   Kos personally warned Plaintiff that Hills Renault was adding a "going concern" note to the financial statements of CMS and INCON.  (Id.)  A "going concern" footnote questions the financial viability of the businesses over the ensuing fiscal year.  (Id.)

From 1996 forward, CMS and INCON's financial statements contained express references to unpaid payroll taxes, penalties, and interest.  (DSUF 53, 112.)  For example, the March 31, 1997 financial statement for CMS states: "At March 31, 1997 and 1996, accounts payable and accrued expenses include $122,400 and $139,000, respectively, representing delinquent payroll taxes, penalties, and interest."  (DSUF 53; Doc. 59, Exh. 29.)  INCON's March 31, 1997 financial statement contained a similar statement: "At March 31, 1997 and 1996, accounts payable and accrued expenses include $311,700 and $550,400, respectively, representing delinquent payroll taxes, penalties, and interest."  (DSUF 53.)

CMS and INCON's financial condition continued to decline in 1998.  (DSUF 107-114.)  According to the financial statements prepared By Hills Renault for the 1998 fiscal year, INCON's delinquent payroll taxes, penalties, and interest totaled $1,192,241.  (DSUF 112.)  CMS's delinquent payroll taxes, penalties, and interest totaled $243,971.  (Id.)  Plaintiff's personal financial statement for the 1998 fiscal year, also prepared by Hills Renault, reflected large losses, negative working capital, and the elimination of Plaintiff's book equity in CMS and

**6**

INCON.  (DSUF 113.)

In April 1999, Plaintiff received a copy of a letter from Richard Howard to Ms. Audrey Chan of the Department of Labor in San Francisco.  Mr. Howard alleged that the assets of CMS and INCON's profit sharing plan might be at risk, since there "appears to be a serious disregard for compliance with basic ERISA laws by the plan's trustee."  (DSUF 111; Doc. 59, Exh. 56.)  Mr. Howard also stated that "the trustee does not return my phone calls ... [and] the 1997 benefit statements have not been provided."  (Id.)  The letter was sent to "Mrs. Wilma Shore, Shore Corp. President" via certified mail.  (Id.)

In March, June, and July 1999, Plaintiff signed large numbers of payroll checks issued to employees.  (DSUF 114; Doc. 59, Exh. 57A, 57B, 57C, 57D.)  The payroll checks drawn on July 26, 2009 and signed by Wilma Shore, were the last checks drawn on CMS and INCON accounts.  CMS and INCON stopped doing business in 2000.[10]  (DSUF 115.)

Following an investigation into the delinquent taxes, the IRS assessed trust fund recovery penalties against Wilma Shore relating to CMS and INCON's outstanding payroll liabilities for eleven tax periods from April 1, 1997 through December 31, 1999.[11]  (DSUF 117.)

---

[10] In late 2000, Plaintiff foreclosed her "loan" and acquired the Redding properties.  (DSUF 116.)

[11] On January 26, 2000 the IRS sent Plaintiff notification that it was planning to assess trust fund penalties against her for the second quarter of 1997, third quarter of 1997, fourth quarter of 1997.  Shortly thereafter, the IRS sent Plaintiff notification that it was planning to assess trust fund penalties against her for the first quarter of 1998, second quarter of 1998, third quarter of 1998, fourth quarter of 1998, first quarter of 1999, second quarter

The IRS assessed penalties against Plaintiff concerning CMS' unpaid tax liabilities in the amount of $38,867.58 for the second quarter of 1997, $36,346.66 for the third quarter of 1997, $39,647.46 for the fourth quarter of 1997, $25,287.07 for the first quarter of 1998, $25,665.25 for the second quarter of 1998, $26,193.58 for the third quarter of 1998, $23,540.84 for the fourth quarter of 1998, $17,642.23 for the first quarter of 1999, $18,670.89 for the second quarter of 1999, $18,519.88 for the third quarter of 1999, and $19,336.95 for the fourth quarter of 1999. (DSUF 120.)

Concerning INCON, the IRS assessed penalties against Plaintiff in the amount of $106,345.58 for the second quarter of 1997, $155,671.18 for the third quarter of 1997, $124,821.18 for the fourth quarter of 1997, $218,437.67 for the first quarter of 1998, $144,667.76 for the second quarter of 1998, $91,513.87 for the third quarter of 1998, $183,554.25 for the fourth quarter of 1998, $171,853.43 for the first quarter of 1999, $217,007.41 for the second quarter of 1999, $143,344.31 for the third quarter of 1999, and $122,304.55 for the fourth quarter of 1999.[12]   (DSUF 120.)

As of July 19, 2009, the total outstanding balance of the federal tax liabilities due from Wilma Shore with respect to CMS and INCON for all tax periods at issue, including interest, is $2,983,797.66.  (DSUF 120.)

---

of 1999, third quarter of 1999, fourth quarter of 1999.

[12]  On January 26, 2000, the IRS sent Wilma Shore formal notification that it was planning to assess a trust fund penalty against her for the quarters ending June 30, 1997, September 30, 1997, and December 31, 1997 for the delinquent employment taxes of CMS and INCON.  A short time later,

1

2                          III. **PROCEDURAL BACKGROUND**.

3        On August 8, 2008, Wilma Shore brought suit against the United

4   States pursuant to 28 U.S.C. § 1346, seeking a refund or abatement

5   of trust fund liabilities assessed personally against her by the

6   IRS. (Doc. 1.)  Plaintiff's first cause of action seeks to recover

7   or abate the alleged erroneously withheld sums, stating that she is

8   neither a "responsible party" nor "acted willfully" as described in

9   26 U.S.C. § 6672.  Plaintiff's second cause of action is brought

10  pursuant to an estoppel theory.

11       On December 17, 2007, the United States filed its Answer to

12  Plaintiff's Complaint and also asserted a counterclaim against

13  Shore. (Doc. 8.)  In its counterclaim, the United States sought to

14  reduce to judgment the contested trust fund liabilities assessed

15  against Shore pursuant to 26 U.S.C. § 6672.  The United States also

16  raised counterclaims against Gregory Shore and Brenda Reynolds,

17  seeking to recover certain trust fund recovery penalties assessed

18  against them.

19       On July 20, 2009, the United States filed a Motion For Summary

20  Judgment to reduce to judgment the outstanding federal income tax

21  liabilities assessed against Plaintiff and Counterclaim-Defendant

22  Wilma Shore and Additional Counterclaim-Defendants Gregory Shore

23  and Brenda Reynolds. (Doc. 52.)  As to Plaintiff and Counterclaim-

24  Defendant Wilma Shore, the United States seeks to reduce trust fund

25  recovery penalties to judgment and for judgment in its favor as to

26  the claims made in Ms. Shore's Complaint.

27       The Government seeks to recover $2,983,797.66 from Wilma Shore

28  in unpaid FICA and income taxes for her involvement in the non-

                                    **9**

1  payment of payroll tax liabilities for Dean's Materials, Inc. and
2  Dean R. Shore, Inc.  The Government contends that Plaintiff, as an
3  officer, director and largest shareholder of CMS and INCON, is
4  responsible for payment of these taxes and acted with reckless
5  disregard in failing to pay federal taxes.

6       Wilma Shore filed her opposition to the United States' summary
7  judgment motion on August 14, 2009.  (Doc. 74.)  In support of her
8  opposition, Plaintiff submitted: (1) a Memorandum opposing the
9  motion ("Memorandum"); (2) the declaration of Art Myatt; (3) the
10 declaration of Dennis Bean, PhD; (4) the declaration of Deanna
11 Covey; and (5) a single Statement of Disputed Facts ("PSDF").
12 (Docs. 72-74.)

13      Wilma Shore opposes summary judgment on grounds that there
14 remains a genuine issue of material fact concerning whether she is
15 a "responsible party" or "acted willfully" under 26 U.S.C. § 6672.
16 Plaintiff contends that a genuine issue of material fact exists
17 because she was President of CMS and INCON "in name only," and was
18 not involved in the day-to-day operations of either company.

19

20                      **IV. <u>LEGAL STANDARD</u>**.

21      Summary judgment is appropriate when "the pleadings, the
22 discovery and disclosure materials on file, and any affidavits show
23 that there is no genuine issue as to any material fact and that the
24 movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
25 56(c).  The movant "always bears the initial responsibility of
26 informing the district court of the basis for its motion, and
27 identifying those portions of the pleadings, depositions, answers
28 to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir.2007).  With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).  "[A] non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *Id*. (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute exists, a district court does not make

**11**

credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## **V. DISCUSSION.**

### A.   Trust Fund Recovery Penalties Under 26 U.S.C. § 6672

The Internal Revenue Code requires employers to withhold federal social security and individual income taxes from the wages of their employees. *See* 26 U.S.C. §§ 3102(a), 3402(a). Although an employer collects this money each salary period, payment to the federal government takes place on a quarterly basis. In the interim, the employer holds the collected taxes in "a special fund in trust for the United States." 26 U.S.C. § 7501(a). These taxes are known as "trust fund taxes." *See Slodov v. United States*, 436 U.S. 238, 243 (1978).

If an employer fails to pay over collected trust fund taxes, "the officers or employees of the employer responsible for effectuating the collection and payment of trust fund taxes who willfully fail to do so are made personally liable for a 'penalty' equal to the amount of the delinquent taxes" under 26 U.S.C. § 6672. *Slodov*, 436 U.S. at 244-45. Section 6672 provides, in relevant part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax ... shall ... be liable to a penalty equal to the total amount of the tax ... not collected, or not accounted for and paid over.

26 U.S.C. § 6672.

1   For the purposes of Section 6672, a "person" includes "an
2   officer or employee of a corporation ... who ... is under a duty to
3   perform the act in respect of which the violation occurs." 26
4   U.S.C. § 6671(b).  Thus, an individual is liable for a penalty
5   under Section 6672 if (1) he is a "responsible person"; and (2) if
6   he acts willfully in failing to collect or pay over the withheld
7   taxes. *Davis v. United States*, 961 F.2d 867, 869-70 (9th Cir.
8   1992).

9       Plaintiff argues that the § 6672 penalty cannot be assessed
10  against her because she was not a responsible person and because
11  she did not willfully fail to pay the delinquent trust fund taxes.
12  (Doc. 74, 2:6-2:23.)  The United States submitted Certificates of
13  Assessment (Forms 4340) for the § 6672 penalty for each quarter.
14  (Doc. 56, Exhs. 1-28.[13])  These forms establish a prima facie case
15  for the United States. *United States v. Jones*, 33 F.3d 1137, 1139
16  (9th Cir. 1994).   Plaintiff cannot prevail unless she can
17  demonstrate by a preponderance of the evidence that either the
18  element of responsibility or the element of willfulness is not met.
19  *See id.*

20

21      1. *Responsible Person*

22      The Ninth Circuit has consistently identified persons who have
23  "the final word as to what bills should or should not be paid, and
24  when" as "responsible" persons under § 6672. *Purcell v. United*
25  *States*, 1 F.3d 932, 936 (9th Cir. 1993).  A person has the final
26  word if that person had "the authority required to exercise

27  _____

28      [13] (Doc. 56, Exhs. 6, 9, 12, 15, 18, 21, 24, and 28.)

**13**

significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact." *Purcell*, 1 F.3d at 937.   In other words, responsibility is a matter of status, duty, and authority, not knowledge. *Davis*, 961 F.2d at 873 (upholding the trial court's finding of "responsible person" based on the plaintiff's position as the president, member of the board, and major shareholder, even though the plaintiff had no knowledge of the tax default).   "Authority turns on the scope and nature of an individual's power to determine how the corporation conducts its financial affairs; the duty to ensure that withheld employment taxes are paid over flows from the authority that enables one to do so." *Purcell*, 1 F.3d at 936.

In the absence of an admission of responsibility, there are various factors which are indicative of significant control.  These factors include "the individual's duties as outlined in the corporate bylaws, his ability to sign checks, his status as an officer or director, and whether he could hire and fire employees." *Hochstein v. United States*, 900 F.2d 543, 547 (2nd Cir. 1990); *see Jones*, 33 F.3d at 1140 (approving use of the Hochstein factors). Other courts have identified additional factors, such as whether the individual held stock in the corporation and whether the individual's signature is on the employer's federal quarterly and other tax returns.  *Greenberg v. United States*, 46 F.3d 239, 243 (3rd Cir. 1994).

The United States has submitted evidence that Plaintiff was the president of the corporations, the corporate bylaws charged Plaintiff with "general supervision, direction and control" of the corporations, Plaintiff reconciled bank accounts, had check signing

**14**

authority, and was a director and majority shareholder of CMS and INCON.   All of this evidence indicates that Plaintiff had significant control over the corporation's finances.  There is also evidence in the record that Plaintiff was involved in the preparation of financial statements for CMS and INCON, as her signature appears on the representation letters to Hills Renault concerning the financial statements for the 1993 to 1999 fiscal years.

Plaintiff acknowledges that she was president of CMS and INCON and the bylaws gave her general supervision and control of the companies.  She also does not dispute that she was the majority shareholder, signed checks on behalf of the companies, reconciled bank accounts, or received a salary.  However, Plaintiff contests any characterization of herself as a "responsible person" during the relevant time frame, and rather casts herself as a passive owner who allowed her son to manage the companies.[14]  (Doc. 74, 4:22-4:27.)   Plaintiff contends that she had only "technical authority and a titular designation" and that Greg Shore "rebuffed her inquiries, screened her telephone calls, and instructed other employees to not answer her questions regarding certain checks and payments."  (Doc. 74, 7:2-7:10.)

Significantly, Plaintiff does not offer any evidence that she lacked the authority to pay CMS or INCON's taxes.  *See Alsheskie v. United States*, 31 F.3d 837, 839 (9th Cir. 1994) (distinguishing the district court's finding that the plaintiff was not a responsible

_____

[14]  Plaintiff also contends that a "family culture" of allowing men to control the business undercuts any explicit finding of "responsibility" under § 6672.

**15**

party from a case where "the record contained no evidence that ...
the responsible party was without authority to pay the taxes.").
Plaintiff's arguments regarding her responsibility focus almost
entirely on her inability to exercise her authority because her son
controlled the daily operations of both CMS and INCON.   This
argument is unavailing.   The "responsibility" prong of the
liability analysis addresses only the existence of authority; the
"willfulness" prong considers the ability of the individual to act
upon his or her authority. *See e.g., Phillips v. IRS*, 73 F.3d 939,
943 (9th Cir. 1995).

     Plaintiff spends much of her opposition brief arguing that she
delegated the day-to-day operations to her son beginning in 1991,
and that this designation continued unimpeded through her
resignation in October 1999.   Plaintiff contends that Gregory
Shore's control over the daily operations of CMS and INCON
precludes her from any liability under § 6672. Although it appears
that Greg Shore conducted CMS and INCON's daily operations, it is
well-established that the duty to ensure that withholding taxes are
collected and paid over to the government, which Plaintiff
possessed, is nondelegable.   *See Purcell*, 1 F.3d at 936
(responsibility to pay taxes cannot be delegated); *Keller v. United
States*, 46 F.3d 851, 854 (8th Cir. 1995)("an otherwise responsible
person does not avoid liability under section 6672 by delegating
his authority to another."); *Thomsen v. United States*, 887 F.2d
12, 17 (1st Cir. 1989) ("delegation will not relieve one of
responsibility; liability attaches to all those under the duty set
forth in the statute.").

     In *Purcell*, the Ninth Circuit held that the delegation of

**16**

responsibility for all financial matters from the "responsible person" to a third person does not shelter the "responsible person" from liability for failing to pay the taxes. Even where a party does not control the daily operations of the company and does not participate in many decisions affecting the companies, she is still liable for the unpaid taxes. *Id*. at 937. It is not a question of what the responsible person does, rather, the inquiry centers on what she could have done, i.e., the extent of her authority. Despite Greg Shore's control over CMS and INCON's daily operations, Plaintiff retained the ostensible authority to pay the taxes. She was the President, a Director, the largest shareholder, and, via her loans and financial involvement, largely controlled the company's finances. This authority supports finding her a "responsible person" under the law. See *Barnett v. I.R.S.*, 988 F.2d 1449, 1454 (5th Cir. 1993) ("The crucial inquiry is whether a party ... by virtue of his position in ... the company, could have had substantial input into such decisions, had he wished to exert his authority.").

Plaintiff also argues that because Greg Shore admitted "responsibility" for the tax deficiency, she cannot be held liable. Plaintiff fails to recognize that under § 6672 liability may extend to more than one corporate officer. *See United States v. Chapman*, 7 F. App'x 804, 807 (9th Cir. 2001) ("Section 6672 applies to all responsible persons, not just the most responsible."); *USLIFE Title Ins. Co. of Dallas v. Harbison*, 784 F.2d 1238, 1243 (5th Cir. 1986) ("The fact that more than one person is responsible for a particular delinquency does not relieve another responsible person of his or her personal liability, nor can a responsible person

**17**

avoid collection against himself on the ground that the Government should first collect the tax from someone else."). The IRS's determination that Gregory Shore and Brenda Reynolds are also responsible for CMS and INCON's failure to pay its withholding taxes for eleven tax periods at issue in this case does not foreclose whether Wilma Shore is also liable under § 6672.

Plaintiff contends that the "IRS has offered no evidence establishing Wilma Shore has the responsibility to pay the withholding taxes ... the evidence will show that Wilma Shore has only 'technical authority and a titular designation.'" (Doc. 74, 7:1-7:3.) Plaintiff cites *Vinick v. United States*, 205 F.3d 1 (5th Cir. 2000), in support of her arguments. However, *Vinick* is factually distinguishable.

In *Vinick*, a corporation's treasurer filed a claim for a refund of taxes paid pursuant to a penalty assessed for the failure to pay payroll taxes.[15] However, the similarities to this case end there. *Vinick* was formally the treasurer of a small company in which he was an investor; but – unlike Wilma Shore – he was neither paid by the company nor engaged in financing its business affairs, had no office at the company, and did not sign checks in the relevant time frame. Throughout the period in question, Vinick was a CPA with his own private practice elsewhere. Plaintiff's engagement and relationship with CMS and INCON bears little, if any, resemblance to the Plaintiff in *Vinick*. There is undisputed evidence that Plaintiff signed payroll checks for CMS and INCON,

---

[15] Following a bench trial, the District Court entered judgment for government. On appeal, the First Circuit held that a treasurer was not a "responsible person" who was liable for failure to pay taxes. *Vinick*, 205 F.3d at 14.

maintained an office at the business, received a salary, reconciled corporate bank accounts, and participated in corporate meetings. The facts and ruling in *Vinick* are not helpful or persuasive in this case.

Despite her arguments to the contrary, Plaintiff's authority was more than nominal.  The undisputed facts are that Plaintiff was president of the corporations; charged with "general active management" of the corporations; was a Director of the corporations; had check signing authority; visited her office at company headquarters a few days a week; and was majority sharholder.   These facts establish that Plaintiff was a "responsible person" under § 6672 for all eleven quarters. *See Schlicht v. United States*, No. 03-1606, 2005 WL 2083103, at *3 (D. Ariz. Aug. 25, 2005) (holding that a corporation's president, who "was charged with 'general active management' ..., had check signing authority, hired and fired employees, and on at least one occasion ... paid trust fund taxes" was a responsible party even though he did not exercise his authority over finances on a regular basis.).  No reasonable jury could conclude otherwise.

*United States v. Chapman*, 7 F. App'x 804, 806, is instructive. In *Chapman*, the Ninth Circuit held that the district court applied an incorrect legal standard to conclude that the taxpayer was not a "responsible person" within the meaning of § 6672:

> After careful examination of the district court's oral decision, we conclude that the district court's finding that [the taxpayer] was not a "responsible person" derives from the use of improper legal standards. First, the district court focused its inquiry on whether [the taxpayer] had knowledge that the taxes went unpaid.  This was error under Davis, where we stated that "[r]esponsibility is a matter of status, duty, and authority, not knowledge." Second,

**19**

> the district court erred by basing its conclusion, in part, on the fact that paying taxes was not part of [the taxpayer's] "functional responsibility." The court specifically emphasized that [the taxpayer] had "nothing to do with taxes, ever, nothing." Our case law teaches the contrary. An individual may be held responsible if he had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact.

*Id.* (citations omitted).

Even if Gregory Shore controlled the daily operations of CMS and INCON, Plaintiff was still responsible, as President, for ensuring that the corporation paid its trust fund taxes. *See Purcell*, 1 F.3d at 937 ("That an individual's day-to-day function in a given enterprise is unconnected to financial decision making or tax matters is irrelevant where that individual has the authority to pay or to order the payment of delinquent taxes."); *Chapman,* 7 F. App'x at 806. Plaintiff, under corporate law, possessed the legal authority to exercise control over the corporation's financial affairs throughout the periods at issue in this case, even if she delegated this responsibility to another financial officer. Plaintiff was a "responsible person" under § 6672 for CMS and INCON for all eleven quarters.

As a matter of law, Plaintiff is a "responsible person" under 26 U.S.C. 6672. The United States' motion for summary judgment on this issue is GRANTED.

2. *Willfulness*

That Plaintiff is a "responsible person" for the relevant tax assessment periods at issue does not resolve whether Plaintiff willfully refused to pay CMS and INCON's taxes for those periods.

**20**

In the Ninth Circuit, willfulness under section 6672 is defined as a "voluntary, conscious and intentional act to prefer other creditors over the United States." *Phillips v. United States*, 73 F.3d 939, 942 (9th Cir. 1996) (quoting *Klotz v. United States*, 602 F.2d 920, 923 (9th Cir. 1979)).  The Ninth Circuit holds that "[i]f a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses..., our precedents require that the failure to pay withholding taxes be deemed 'willful.'" *Buffalow v. United States*, 109 F.3d 570, 573 (9th Cir. 1997) (quoting *Phillips*, 73 F.3d at 942).   The question of willfulness is a factual one and if sufficiently controverted, would preclude the granting of summary judgment on penalty liability." *Teel v. United States*, 529 F.2d 903, 905 (9th Cir. 1976).

The Ninth Circuit recognizes two ways by which the government can establish willfulness.  First, the government may show that the responsible person had actual knowledge that payroll taxes were not being collected or paid over, and thereafter made payment to a non-IRS creditor.   Second, a responsible person may be deemed "willful" if he or she acted in "reckless disregard of whether the taxes [were] being paid over." *Phillips*, 73 F.3d at 942 (stating that "a responsible person is liable under the reckless disregard standard if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily.") (citation and quotation omitted).

A review of the record evidence reveals a genuine dispute on the ultimate issue of whether Plaintiff *clearly* ought to have known

that there was a grave risk that withholding taxes were not being paid and if she was in a position to find out for certain very easily.   The government contends that Plaintiff acted with "reckless disregard" by failing to ensure that CMS and INCON's taxes were paid after learning about CMS and INCON's poor financial condition and that past payroll taxes were not paid.   To support its latter contention, the government relies on the fact that several checks payable to the IRS were returned for insufficient funds in early 1997, prior to the periods at issue in this case.[16] This, the government argues, created a risk that IRS and INCON were delinquent and made it incumbent upon Plaintiff to ensure that the government was being paid before making payments to non-IRS creditors.[17]

---

[16] A review of the checks, one of which was returned twice, show Plaintiff's handwritten notations on each check.  However, the record reveals that a substantial number of these checks eventually cleared CMS and/or INCON's accounts.

[17] At oral argument, Plaintiff argued that only Plaintiff's conduct in the relevant quarters in which liability was assessed can be used to determine § 6672 liability.  Plaintiff averred that Plaintiff's conduct outside of the eleven tax periods at issue - i.e., prior to 1997 - is irrelevant and inadmissible.  Here, evidence of Plaintiff's loans in 2003 (which remained outstanding until 2000), as well as the warnings by Mr. Howard in 2004 and Ms. Koz in 2006 are relevant to demonstrate Plaintiff's awareness of CMS and/or INCON's dire financial condition in early 1997 and whether her reliance on Greg Shore was reasonable.  *See Purcell*, 1 F.3d at 938 (liability under Section 6672 for person who paid out corporate funds to other creditors after the period in question rather than remitting taxes to the government); *Turner v. United States*, No. C04-2080Z, 2005 WL 3747959 at *8 (W.D. Wash. Dec. 30, 2005) (outside tax period evidence was relevant because it showed taxpayer's authority to influence who got paid from corporate funds); *Jefferson v. United States*, 546 F.3d 477, 481 n.1 (7th Cir. 2008) (reviewing outside tax period evidence "made sense" because Jefferson was "involved with the day care for over twenty years

1    Plaintiff's primary argument in rebuttal is that a material
2  issue of fact exists because Greg Shore, who she trusted, misled
3  her by asserting that he had taken care of the matter or would take
4  care of the matter.  Specifically, Plaintiff argues that she never
5  clearly ought to have known about CMS and INCON's tax deficiencies
6  because, "Greg Shore controlled the check book and decisions as to
7  what creditor was being paid ... Greg repeatedly assured
8  [Plaintiff] that finances of the corporation were being taken care
9  of."  Drawing factual inferences in her favor, Plaintiff maintains
10 it was reasonable for her to trust her son despite her fiduciary
11 obligations, as a responsible party, to care properly for the funds
12 temporarily entrusted to the corporation for the ultimate use of
13 the United States.[18]

14    The critical inquiry in this case is whether Plaintiff showed
15 such reckless disregard for a known or obvious risk by failing to
16 ascertain whether monies withheld from employees wages were
17 remitted to the government after CMS and INCON began to flounder.
18 The United States argues that applying *Phillips* to the facts of
19 this case, there is no genuine dispute of material fact that

20

21 [and] there is no evidence that Jefferson's involvement with
22 managing the day care's finances ceased at any time before or
   during the relevant fiscal period.").
23

24    [18] Plaintiff also attempts to defeat any notion that she
25 recklessly disregarded a risk by pointing out that a number of the
   "bounced" IRS checks eventually cleared CMS and/or INCON accounts,
26 and she only signed a few checks to creditors and did not sign or
   prepare tax returns.  As to the financial statements, there is
27 deposition testimony by Plaintiff that CMS and INCON's financial
   statements were given to, and maintained by, Greg Shore.  Plaintiff
28 testified that she never reviewed CMS and INCON's financial
   statements.

**23**

1  Plaintiff met the Ninth Circuit's standard for reckless disregard.
2  However, in *Phillips*, the taxpayer was aware that the employee he
3  entrusted with the responsibility to remit the withholding taxes
4  had previously failed to pay them.   Specifically, the taxpayer
5  previously paid an IRS assessment for failure to pay federal
6  withholding taxes and told the employee to "not let it happen
7  again."  Subsequently, the same employee neglected to pay federal
8  withholding taxes and the IRS assessed the penalty against the
9  taxpayer.[19]   The facts supporting a finding of willfulness, in
10 *Phillips,* i.e., the taxpayer's actual knowledge of the previous
11 failure to remit withholding taxes, are not present in this case.

12      The United States cites other authority to support its
13 argument that there is no genuine dispute of fact as to Plaintiff's
14 reckless disregard of a grave risk. *Wright v. United States*, 809
15 F.2d 425, 427 (7th Cir. 1987); *Thomsen v. United States*, 887 F.2d
16 12, 18 (1st Cir. 1989).  However, in *Wright*, the court held Wright
17 was liable for the penalty because he had actual knowledge of the
18 prior delinquency.  Like *Phillips,* the same individual responsible
19 for the prior delinquency of the company continued to be a
20 principal of the company, and the company's financial picture
21 worsened, leading to a second delinquency. *Wright*, 809 F.2d at
22 426-27. Similarly in *Thomsen*, the taxpayer had actual notice of an
23 employee's failure to remit taxes, yet continued to delegate that
24 responsibility to the failing party without taking steps to insure

25

26      [19] The Ninth Circuit found the taxpayer to be "willful" under
27 26 U.S.C. 6672 because he was aware that the employee he entrusted
   with the responsibility to remit the withholding taxes had failed
28 once before to pay them, yet he never inquired whether taxes were
   being paid.    *Phillips*, 73 F.3d at 943-44.

payment.  *Thomsen*, 887 F.2d at 17-18.  The key difference between *Wright* and *Thomsen* and this case, and the reason summary judgment is precluded, is that a factual dispute exists whether and to what extent Plaintiff was on notice that Greg Shore had mismanaged the corporation and whether he could be trusted to pay either CMS or INCON's payroll taxes.  Even applying *Wright* and *Thomsen*, the factual dispute remains.

In this case, in addition to not having day-to-day control over the finances, Plaintiff signed only a few checks to creditors and did not sign or prepare tax returns.  These differences are important because the greater control and responsibility one has over the taxes and finances of a company, and over the payment of creditors, the sooner one "clearly ought to have known" of the risk that withholding taxes were not paid.  In some situations where the taxpayer had greater immediate control over and responsibility for a company's finances or check writing, such as *Phillips*,[20] knowledge that the company has financial difficulties could be sufficient to establish recklessness with respect to nonpayment of taxes, but that is not true in this case.[21]

---

[20] In *Phillips*, the taxpayer maintained check writing authority and conceded that he made the final decision on what creditors to pay.  *Phillips*, 73 F.3d at 943.

[21] Plaintiff's lack of immediate responsibility for finances and taxes and her lack of knowledge of past or present tax deficiencies--if believed, distinguish this case from those in which responsible parties without knowledge that withholding taxes were not paid, are nonetheless found "willful" under § 6672.  In *Jefferson v. United States*, 546 F.3d 477 (7th Cir. 2008), for example, the evidence suggested that Jefferson, the President of the board of directors, was not only aware of the company's history of tax payment problems--he sent two checks on company's behalf to the IRS for past taxes--, but he was also aware of its continued

1    Viewing the evidence in a light most favorable to Plaintiff,
2  drawing all inferences in her favor, there remains a genuine issue
3  of material fact as to whether she acted with reckless disregard.
4  On her account, Greg Shore, who she trusted, misled her by
5  asserting that he had taken care of the matter or would take care
6  of the matter.  If believed, a dispute exists whether Plaintiff,
7  once aware of the liability to the government, reasonably
8  discharged her duty to ensure that the taxes were paid before any
9  payments were made to other creditors.  The extent and nature of
10 her knowledge after the first 1997 check to the IRS was returned,
11 raises the question of whether Plaintiff could continue to
12 reasonably rely on Greg's statements that "everything was taken
13 care of."  A factual dispute exists whether and to what extent
14 Plaintiff was on notice and knew that Greg Shore had mismanaged the
15 corporation and whether he could be trusted to pay either CMS or
16 INCON's payroll taxes.  Whether Plaintiff acted recklessly by
17 continuing to rely on the assurances of a person she may have known
18 failed to file federal withholdings in 1997, must be weighed and
19 given effect by the trier of fact.

20    Ninth Circuit cases suggest that once a responsible party
21 knows a delegatee failed to pay over withheld taxes, continuing to
22 rely blindly on that delegatee can amount to reckless disregard
23 under the totality of the circumstances.  *See Phillips*, 73 F.3d at

24

25 poor financial state.  Although Jefferson reviewed monthly reports
26 showing a steadily increasing tax liability, he did not investigate
   whether subsequent tax obligations were met.  The Seventh Circuit
27 affirmed summary judgment against Jefferson, holding he acted
   "willfully" because he ignored signs that the taxes were unpaid and
28 was aware of the center's financial difficulties.

**26**

943; *Purcell*, 1 F.3d at 937-38.   Whether Plaintiff recklessly disregarded a known, palpable risk that withholdings would not be paid by continuing to rely on Greg Shore's mismanagement of CMS and INCON is in dispute.   A rational trier of fact could infer that Plaintiff did not know of any tax deficiencies, had little immediate involvement in the company's finances and taxes, and reasonably relied on Gregory Shore to manage CMS and INCON.   *See Teel*, 529 F.2d at 905 ("The question of willfulness is a factual one and if sufficiently controverted, would preclude the granting of a summary judgment on penalty liability.").

At oral argument, Plaintiff reiterated that she did not act with reckless disregard because Greg Shore controlled the financial affairs of CMS and INCON, and she trusted his word that they were financially viable and was in effect misled.   The government pointed out that Plaintiff "had to be aware" of the unpaid employment taxes when four checks payable to the IRS, each for $25,000, bounced in early 1997.[22]   Plaintiff responded that "a number of these checks that we're talking about in those prior quarters, went through a second time and cleared."   This evidence bears directly on Plaintiff knowledge of a past delinquency – and Greg Shore's management of CMS and INCON – and must be weighed by the trier of fact.

There is a genuine dispute whether Plaintiff *clearly* ought to have known that there was a grave risk that withholding taxes were

---

[22] Plaintiff does not identify the checks or their time periods, but Plaintiff is likely referring to the checks made out to the IRS in early 1997 for $140,519.50 (January 1997), $30,000 (January 1997), $10,000 (February 1997), and three checks for $10,000 in March 1997.   (Doc. 59, Exhs. 54 & 55.)

not being paid from 1997 onward, which would cover the eleven tax periods at issue.  Although a close call, the dispute over Plaintiff's willfulness continues to be genuine through the second, third, and fourth quarters of 1999.  In her April 14, 2009 deposition, Plaintiff admitted that she signed payroll checks on March 5, March 26, June 11, and July 30, 1999 without checking to see if payroll taxes had been paid.  On April 9, 1999, Mr. Howard sent Plaintiff a letter concerning CMS and INCON's profit sharing plan.  However, Plaintiff testified that the checks were "rushed," she signed only because "Greg and Brenda were not in the office," and she does not recall receiving the letter or whether Ms. Kos discussed the companies' financial status prior to this time. (Shore Dep.  186:23-187:25.)  At this time, according to her testimony, Plaintiff continued to be misled concerning CMS and INCON's payroll deficiencies.  Although less persuasive, these circumstances bear on whether Plaintiff willfully, voluntarily, or intentionally ignored her duty to pay CMS and/or INCON's taxes.  A factual dispute remains whether Plaintiff acted willfully throughout the eleven relevant quarters, including the last three quarters of 1999.

The evidence introduced by the parties on the question of willfulness is conflicting and susceptible of at least two reasonable interpretations for the eleven tax periods at issue.  A jury must decide whether Plaintiff acted recklessly by relying on the assurances of a person she may have known failed to file federal withholdings in 1997.  *See Thomsen*, 887 F.2d at 19 ("A jury question would, of course, arise if there were a genuinely disputed issue of fact as to whether [the taxpayer] was actually on notice

28

that the person to whom he delegated responsibility for collecting, accounting for, and paying over the taxes had failed to fulfill that responsibility in the past.").

Plaintiff created a disputed issue of material fact as to the issue of willfulness.  The government's motion for summary judgment is DENIED on this issue.


3.  *Conclusion*

After viewing the entirety of the evidence in Plaintiff's favor, drawing all inferences in her favor, Plaintiff's evidence does not raise a genuine issue of fact as to her "responsibility" under § 6672.  Summary judgment is GRANTED in favor of the United States as to Plaintiff's status as a responsible person.

However, Plaintiff has created a genuine dispute as to "willfulness."  Whether Plaintiff acted willfully under § 6672 must be determined by the trier of fact.  The United States' motion is DENIED as to whether Plaintiff acted "willfully" as that term is defined by § 6672.


B.  Plaintiff's Estoppel Claim

The United States moves for summary judgment on Plaintiff's equitable estoppel claim.  Plaintiff argues that the government's actions, specifically, IRS Advisor Carol Johnson's purported representations -- reasonably led her to believe that her 2006 settlement offer was accepted.  Plaintiff also alleges that the IRS did not properly inform her of collection efforts against her. Plaintiff maintains that these two grounds support the doctrine of equitable estoppel, preventing the IRS from enforcing trust fund

penalties against her.

"A party seeking to raise estoppel against the government must establish affirmative misconduct going beyond mere negligence; even then, estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989).  When estoppel is available, the court then considers its traditional elements, which include that "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Watkins*, 875 F.2d at 709.

To establish estoppel, Plaintiff's primary argument is that she reasonably relied on IRS Advisor Carol Johnson's representations that the IRS accepted the 2006 settlement offer. According to Plaintiff, Agent Johnson notified Mr. Satterburg, Plaintiff's representative, that Plaintiff's Offer and Compromise was accepted by all the necessary people and "based upon this communication, Plaintiff felt relieved and did not pursue any other actions to resolve this problem."  (Doc. 74, 11:15-11:19.)  To invoke estoppel against the government, Plaintiff must show "affirmative misconduct going beyond mere negligence."  The Ninth Circuit has explained that this type of conduct does not rise to the level of "affirmative misconduct" necessary to invoke estoppel against the government.  *See Buffalow v. United States*, 109 F.3d 570 (9th Cir. 1997).

**30**

In *Buffalow*, the President and sole shareholder of a corporation sought a refund of corporation's trust fund taxes which Buffalow paid as person responsible for taxes.  The government counterclaimed for unpaid trust fund taxes.  Plaintiff moved for summary judgment, arguing that the government was estopped from collecting the penalties because an IRS officer encouraged Buffalow to keep the business going and behaved in a manner that led Buffalow to believe that the IRS would not seek to hold him personally responsible for the taxes.  The Ninth Circuit held that Plaintiff did not establish "affirmative misconduct":

> [i]t takes much more than that to bind the government. Buffalow's letter to the revenue officer could not have been a true settlement with the government because it was not accepted in writing. If Buffalow made a mistake in that regard, his mistake cannot save him. Beyond that, what we said in Purcell applies here: 'We are sympathetic to [his] plight.' However, at most the revenue officer 'encouraged' him to keep the business going, and behaved in a manner that led him to believe that the IRS would not seek to hold him personally responsible for the ... taxes.  This testimony at best established a mere omission or negligent failure on [the revenue officer's] part. That will not suffice to estop the government.

*Buffalow*, 109 F.3d at 573-574 (citations omitted).

Whether or not Agent Johnson orally approved of Plaintiff's settlement offer, it is clear that Agent Johnson's conduct did not rise to the level of "affirmative misconduct" as defined by the Ninth Circuit.  Like *Buffalo* and *Landel Corp. v. United States*, No. C04-0452RSM, 2005 WL 1155709 (W.D.Wash. Feb.16, 2005),[23] neither the

---

[23] Under facts similar to *Buffalow* and this case, Plaintiff in *Landel* argued that the government was estopped from assessing federal withholding penalties against it because Plaintiff understood that it reached settlement agreement, and the IRS did not repudiate that understanding by responding to Plaintiff's

Revenue Agent nor the IRS explicitly approved, in writing, of Plaintiff's settlement proposal.   At best, there were oral affirmations.[24]  This is not a settlement or affirmative misconduct. Under *Buffalow* and its progeny, such conduct is a "mere omission or negligent failure on the revenue officer's part ... [t]hat will not suffice to estop the government."  *Id*. at 573-574.

In this case, Plaintiff suffered no prejudice.  A settlement with the government must be reduced to writing.  Plaintiff alleges no detrimental reliance or prejudice that resulted.  Plaintiff's contentions of being "kept out of the loop" are not relevant to the key elements of estoppel.  "Failing to inform" Plaintiff of the collection efforts against her does not rise to the level of "affirmative misconduct" necessary to invoke estoppel against the government.[25]

Also fatal to Plaintiff's estoppel claim is that she does not

---

letter.  *Landel* determined that Plaintiff's argument was meritless, noting that there was no written settlement agreement and "the Ninth Circuit Court of Appeals has held that testimony such as [Plaintiff's representative's] 'will not suffice to estop the government.'"  *Landel,* 2005 WL 1155709 at *5.

[24] During oral argument, Plaintiff argued that there was written evidence of the settlement agreement, but "[w]e've never been able to obtain it through freedom of information, but we were told that it existed."  To date, neither Plaintiff nor Defendant has produced a copy of the purported written settlement agreement. It is not part of the record.

[25] According to the United States, Plaintiff confuses IRS collection efforts with its penalty investigation.  As part of its collection efforts, the IRS contacted Gregory Shore, who attempted to settle the outstanding obligations.   There was no need to contact Plaintiff at that time.  Subsequently, the IRS initiated an investigation into possible TFRP assessment.  Based on the record, the IRS attempted to contact Plaintiff as part of this penalty investigation.

establish that Revenue Agent Johnson had authority to bind the government. It is well-established that a "purported agreement with United States is not binding unless the party can show that official with whom agreement was made had authority to bind United States." *Grosinsky v. United States*, 947 F.2d 417, 419 (9th Cir. 1991); *see D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed Ct. 1997) ("[a] contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States.")(citation omitted). There is no evidence, and Plaintiff points to none, that Agent Johnson had actual authority to bind the United States.

After viewing the entirety of the evidence in Plaintiff's favor, drawing all inferences in her favor, Plaintiff has failed to offer any evidence or allege specific facts that would create a genuine issue of material fact concerning equitable estoppel. Summary judgment is GRANTED in favor of the United States regarding Wilma Shore's second cause of action for estoppel.

///
///
///
///
///
///
///
///
///
///
///

1

IV.   <u>CONCLUSION</u>.

2

For the reasons discussed above:

3

1.    Summary judgment is GRANTED in favor of the United States

4

as to Plaintiff's status as a responsible person as that term is

5

defined under § 6672.  Summary Judgment is DENIED as to whether

6

Plaintiff acted "willfully" under § 6672.

7

2. Summary judgment is GRANTED in favor of the United States

8

as to the estoppel cause of action contained in Wilma Shore's

9

complaint, filed August 8, 2008.

10

11

The United States shall submit an order consistent with this

12

decision within five (5) days of electronic service.

13

14

IT IS SO ORDERED.

15

**Dated:    October 9, 2009**                          **/s/ Oliver W. Wanger**

16

                                        UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

**34**